AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original



CLERK'S OFFICE
A TRUE COPY
Aug 02, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>285 Ledgewood Drive, Fond du Lac, WI 54937, including any<br>common areas accessible by the occurpants of the subject<br>property, any storage units or outbuiildings and any<br>appurtenances thereto, as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **24-M-457 (SCD)** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____8-15-24_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ❑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Stephen C. Dries_____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*    ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____8-2-24. 12:15 pm_____

*Judge's signature*

City and state:  Milwaukee, WI

Stephen C. Dries, U.S. Magisrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

 

                                     _____
                                            *Executing officer's signature*

                                     _____
                                             *Printed name and title*

**Attachment A**

DESCRIPTION OF LOCATIONS TO BE SEARCHED:

1.  The entire property located at **285 LEDGEWOOD DRIVE, FOND DU LAC, WI, 54937**. The residence is more particularly described as an apartment within the Meadowview Homes Apartments at Whispering Springs. Apartment 285 is located in the second of three buildings, recessed into the building between apartments "283" and "287". The number "285" is affixed to the exterior entrance to the apartment. This warrant authorizes the search of the SUBJECT PREMISES, any common areas accessible by the occupants of the SUBJECT PREMISES, any storage units or outbuildings associated with the SUBJECT PREMISES, as well as any appurtenances thereto. The exterior of the SUBJECT PREMISES has off-white with a quarter wall light colored brick facade. The residence has a walkway that extends from the parking lot to a white or cream front door on the west side of the building facing Ledgewood Drive.

Pictures of the residence are provided below:



- Computers and storage media found therein believed to belong to Nicholas Orr.

- Any person who appears to reside at the SUBJECT PREMISES believed to be maintaining a device belonging to Nicholas Orr on their person.

2

## Attachment B

### Items to be Seized

1. Cell phones, computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors believed to belong to or utilized by Nicholas Orr that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs believed to have been utilized by Nicholas Orr.

3. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) believed to belong to or utilized by Nicholas Orr pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

3

5.  Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by Nicholas Orr through the operation of any device by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.  Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) believed to belong to or utilized by Nicholas Orr, identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.  Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) believed to belong to or utilized by Nicholas Orr, concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.  Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr concerning communications between individuals about child pornography or the existence of

4

sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr that concern any accounts with an Internet Service Provider.

11. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12. Any and all cameras, film, videotapes or other photographic equipment believed to belong to or utilized by Nicholas Orr.

13. Any and all visual depictions of minors believed to belong to Nicholas Orr.

5

14. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr, pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities by Nicholas Orr with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16. For any electronic storage device, computer hard drive, electronic device, or other physical object believed to belong to or utilized by Nicholas Orr upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

6

b.  evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

e.  evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h.  evidence of the times the electronic storage device was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j.  documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device;

k.  contextual information necessary to understand the evidence described in this attachment.

17. Records and things evidencing the use by Nicholas Orr of the Internet Protocol addresses to communicate with the internet, including:

7

a. routers, modems, and network equipment used to connect electronic storage devices to the Internet;

b. records of Internet Protocol addresses used;

c. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of residents of the SUBJECT PREMISES to the Touch ID sensor of device(s) or scan for facial recognition, such as an iPhone. Android, or Tablet, found at the premises for the purpose of attempting to unlock the device via fingerprint or facial recognition in order to search the contents as authorized by this warrant. If facial recognition is required, the subject will remain still and look, with eyes open, at the camera for any devices seized in connection if this warrant for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

8

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Aug 02, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

285 Ledgewood Drive, Fond du Lac, WI 54937, including any common areas accessible by the occurrants of the subject property, any storage units or outbuiildings and any appurtenances thereto, as further described in Attachment A

)
)
)
)
)
)
)

Case No. **24-M-457 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) and (e);18 U.S.C. § 222A(a)(1) and (2); 18 U.S.C. § 2252A(a)(5)(B) | Production of child pornography, transport, distribute and receive child pornography and possession of child pornography |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Gartland, Special Agent FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 8-2-24 _____

_____
*Judge's signature*

City and state: _____ Milwaukee, WI _____

Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Daniel Gartland, being first duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since May 2018. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request search and arrest warrants. I am currently assigned to the FBI Milwaukee Division and am a member of the Milwaukee Child Exploitation and Human Trafficking Task Force.  I am authorized to investigate violent crimes against children, to include the possession, production, and distribution of child sexual abuse material (commonly known as "CSAM"). While employed by the FBI, I have investigated federal criminal violations related to child exploitation, and child pornography. I have received training to investigate child pornography and child exploitation crimes and have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256) in different forms of media including computer media.   As a result of my training, experience, and discussions with other law enforcement officers assigned to investigate child pornography and child exploitation, I am familiar with methods by which electronic devices are used as the means for receiving, transmitting, possessing, and distributing images and videos depicting minors engaged in sexually explicit conduct. I have also received training and gained experience in interview and interrogation techniques with enhanced training specific to cybercrimes, social media search warrants, residential search warrants, interviews and interrogations of subjects of criminal investigations, as well as electronic device identification and forensic review.

2. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider truthful and reliable.

3. Based upon the information described below, I submit that probable cause exists to believe that the subject(s) residing at **285 LEDGEWOOD DRIVE, FOND DU LAC, WI, 54937** (SUBJECT PREMISES) has committed the crimes in violation of 18 U.S.C. § 2251(a) and (e), which make it a crime to produce child pornography, 18 U.S.C. § 2252A(a)(1) and (2), which makes it a crime to transport, distribute and receive child pornography, and 18 U.S.C. § 2252A(a)(5)(B), which makes it a crime to possess child pornography. I further submit that evidence relating to this crime, more particularly described in Attachment B, can be found in the SUBJECT PREMISES, more particularly described in Attachment A.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

DEFINITIONS

5. The following definitions apply to the Affidavit and Attachment B to this Affidavit:

a. "Child Pornography" is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor

2

engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

b.      "Child erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c.      "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.  See 18 U.S.C. § 1030(e)(1).

d.      "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral

3

conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

f. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g. An "Internet Protocol address" (IP address) is a unique numeric address used by internet-enabled electronic storage devices to access the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every electronic storage device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that electronic storage device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static that is, long-term IP addresses, while other computers have dynamic that is, frequently changed IP addresses.

h. "Internet Service Providers" ("ISPs")are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

i. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

j. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including

4

writings and drawings), photographic form (including prints, negatives, videotapes, motion pictures, and photocopies), mechanical form (including printing and typing) or electrical, electronic or magnetic form (including tape recordings, compact discs, electronic or magnetic storage devices such as hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

k. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

l. "Visual depictions" include undeveloped film and videotape, and data stored on a computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

m. "Website" consists of text pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

## ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS

6. I am aware through training, experience, and consulting with other law enforcement agents/analysts with specialized knowledge and training in computers, networks, and Internet communications that to properly retrieve and analyze electronically stored (computer) data, and to

5

ensure accuracy and completeness of such data and to prevent loss of the data either from accidental or programmed destruction, it is necessary to conduct a forensic examination of the electronic storage devices. To ensure such accuracy and completeness, it may also be necessary to analyze not only the electronic storage devices, but also peripheral devices which may be interdependent, the software to operate them, and related instruction manuals containing directions concerning operation of the device computer and software. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the proposed search location, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive, other storage media, within a hand-held electronic device such as a cellular telephone or a tablet device (e.g., an iPad device). Some of this electronic information, as explained below, might take a form that becomes meaningful only upon forensic analysis.

7. Based on my knowledge, training, and experience, I know that computer and other electronic device hardware, peripheral devices, software, documentation, and passwords may be important to a criminal investigation in three distinct and important respects.

      a. The objects themselves may be instrumentalities used to commit the crime;

      b. the objects may have been used to collect and store information about crimes (in the form of electronic data); and

      c. the objects may be contraband or fruits of the crime.

8. I submit that if a computer or other electronic storage device is found on the premises, there is probable cause to believe those records will be stored in that electronic storage device, for at least the following reasons:

6

a.     Based on my knowledge, training, and experience, I know that electronic storage device files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person deletes a file on an electronic storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. It follows that deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten. In addition, if the electronic storage device uses an operating system (in the case, for example, of a computer, cellular telephone, or tablet device) the device may also contain a record of deleted data in a swap or recovery file.

b.     Wholly apart from user-generated files, electronic storage device storage media in particular, computers' internal hard drives, contain electronic evidence of how the device was used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, and file system data structures. Electronic storage device users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information.

c.     Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or cache.  The browser often maintains a fixed

amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

9.      As further described in Attachment B, this application seeks permission to locate not only electronic storage device files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic storage devices were used, the purpose of their use, who used them, and when.

10.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), electronic storage device storage media can contain other forms of electronic evidence as described below:

a.      Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic storage device was in use.  Electronic storage device file systems can record information about the dates files were created and the sequence in which they were created.

b.      As explained herein, information stored within an electronic storage device and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

8

In my training and experience, information stored within an electronic storage device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the electronic storage device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the electronic storage device was remotely accessed, thus inculpating or exculpating the electronic storage device owner. Further, electronic storage device activity can indicate how and when the electronic storage device was accessed or used. For example, as described herein, computers typically contain information that logs computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within an electronic storage device may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer or cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera). The geographic and timeline information described herein may either inculpate or exculpate the electronic storage device user. Last,

9

information stored within an electronic storage device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information within the electronic storage device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the electronic storage device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Whether data stored on an electronic storage device is relevant to the investigation may depend on other information stored on the electronic storage device and the application of knowledge about how an electronic storage device works. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

d. Further, in finding evidence of how an electronic storage device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner.

11. Based upon my knowledge, training and experience, and after having consulted with FBI computer forensic personnel, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a

10

controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some electronic storage device equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how an electronic storage device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c. Technical requirements. Electronic storage devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic storage device hardware and software available makes it difficult to know before a search what tools or knowledge will be required to

11

analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

12. In light of these concerns, I hereby request the Court's permission to seize the electronic storage devices, associated storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

13. I know that when an individual uses a computer to commit crimes involving child pornography, the individuals' computer and/or electronic devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic storage device is an instrumentality of the crime because it is used as a means of committing the criminal offense. From my training and experience, I believe that an electronic storage device used to commit a crime of this type may contain data that is evidence of how the electronic storage device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

## BIOMETRIC ACCESS TO DEVICES

14.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

15.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

16.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

13

Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

17. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

18. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

19. As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

14

20.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

21.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request authority for law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the residents of the SUBJECT PREMISES to the fingerprint scanner of the devices found at the SUBJECT PREMISES or on residents of the SUBJECT PREMISES' person(s); (2) hold the devices found at the SUBJECT PREMISES  or on the person of residents of the SUBJECT PREMISES in front of residents of the SUBJECT PREMISES' face to activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES or on the person of residents of the SUBJECT PREMISES in front of residents of the SUBJECT

15

PREMISES' face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

22.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

23.     I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

16

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

24.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the

17

times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may

18

provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence to conceal it from law enforcement).

  c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

  d.  The process of identifying the exact files, pieces, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a

19

computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

25.  Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always

20

possible to search computer equipment and storage devices for data for several reasons, including the following:

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.      Computer users can attempt to conceal data within computer equipment and storage devices through several methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a

21

user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

26. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access

22

the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

27.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**PROBABLE CAUSE**

28.     On August 1, 2023, M.A. submitted an online tip to the FBI regarding the potential exploitation of his 9 year-old daughter (Minor Victim 1) through the Snapchat application. M.A. learned that an unknown Snapchat user obtained a topless photo of Minor Victim 1 and encouraged her to view pornography by sending her links to pornographic videos. The unknown Snapchat user was the subject of a separate investigation conducted by law enforcement in Iowa.

29.     A consent search of Minor Victim 1's cellular telephone and a forensic interview of Minor Victim 1 revealed that she may have been victimized or communicated with other victims through the Instagram application, in addition to Snapchat.

30.     On or about August 31, 2023, Meta Platforms, Inc. provided data in response to a search warrant requesting information and records associated with Minor Victim 1's Instagram account, to include subscriber information, communications, photos, and videos.  During a review

23

of the information, investigators identified a conversation between the Instagram account bearing display name "cjcj" and username "stranger_things2132" (Hereinafter "Stranger Things"). The user of the account represented themselves to be a female named "Cassie," going into 5th grade. The conversation was initiated on July 8, 2023 and concluded on July 17, 2023.

31.     On July 10, 2023, Stranger Things sent a message to Minor Victim 1 indicating that a man had sent her a picture of his penis. "Cassie" indicated the man forced her to send an inappropriate picture of herself back, which she said she did.

32.     On July 16, 2023, Stranger Things initiated a conversation suggesting she and Minor Victim 1 share screenshots of the photo gallery on their cellular telephones. Stranger Things sent a photo which included multiple thumbnails depicting the same naked female and a thumbnail appearing to be a video of the child manipulating her vagina. The female appeared to be approximately 8 to 11 years-old with dark shoulder length hair and a tan skin tone. Minor Victim 1 responded with a screenshot of her photo gallery. Stranger Things responded, "I'm surprised you don't have anything inappropriate [winking tongue out emoji], unless you have a secret folder [crying laughing emoji]." After additional communications, Stranger Things dared Minor Victim 1 to send a video of herself. The accounts then appeared to exchange videos that were not retained in Meta Platforms, Inc's records.

33.     On September 13, 2023, Meta Platforms, Inc. provided information in response to a subpoena requesting user account information and IP address logs associated with Stranger Things. The information revealed that the account was accessed by IP address 2600:6c44:637f::ceb5:c523:79fa:eecb:cd93 on July 5, 2023 and IP address 2600:6c44:637f:c9c2:38db:ec80:e4a0:4ee6 on August 9, 2023.

24

34. On September 21, 2023, Charter Communications provided information in response to a subpoena requesting subscriber information associated with IP addresses used to access Stranger Things. On July 5, 2023, IP address 2600:6c44:637f::ceb5:c523:79fa:eecb:cd93 was assigned to the service address of 77 6th Street, Fond Du Lac, Wisconsin, 54935. On August 9, 2023, IP address 2600:6c44:637f:c9c2:38db:ec80:e4a0:4ee6 was assigned to the service address of 90 Warner Street, Fond Du Lac, WI, 54935.

Investigation of Stranger Things

35. On or about December 20, 2023, Meta Platforms, Inc. provided data in response to a search warrant requesting information and records associated with the Stranger Things Instagram account, to include subscriber information, communications, photos, and videos. The following subscriber information was provided:

    a.     Name: cjcj

    b.     Phone numbers: +19202514725 Unverified

    c.     About me: Fun, energetic, gay [rainbow emoji] love my friends and family No creeps please (Single) @preppy_1292 is my backup please follow me on there and here [smile emoji]

36. Investigators conducted a review of communications between Stranger Things and other Instagram accounts. Multiple conversations were observed in which Stranger Things would introduce themselves as "Cassie," state their age was 10, and send a selfie-style photo of the same child observed in communications with Minor Victim 1. Stranger Things would then invite girls to join her "girls only" group chat. Stranger Things described the group in multiple ways, including stating, "you can share anything you want be inappropriate share picture inappropriate or not most of us are gay or bi in the group too", "Girls only NO BS NO DRAMA NO BOYS," and "girls only

25

private group chat it's a naughty group post anything." Stranger Things also created a "preppy" group and a group for discussing manicures and pedicures.

37.     The following conversation reflected the typical manner in which Stranger Things initiated conversations with minor females on Instagram:

26

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-15 20:20:11 UTC
    **Body** Hi ☺ ☺ I'm Cassie 😊

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-15 20:20:22 UTC
    **Body** You sent an attachment.

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-31 13:34:12 UTC
    **Body** ❤️
    **Share**      **Date Created** Unknown

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-31 16:30:54 UTC
    **Body** Hi 😊

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-31 16:31:04 UTC
    **Body** You sent an attachment.

**Author** rose.sotak (Instagram: 59082461875)
    **Sent** 2023-07-31 16:43:35 UTC
    **Body** Hi

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-31 16:43:48 UTC
    **Body** I just wanted to say that you were really pretty first of all

**Author** rose.sotak (Instagram: 59082461875)
    **Sent** 2023-07-31 16:43:56 UTC
    **Body** Thanks

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-31 16:44:36 UTC
    **Body** Ofc and also thank you for following me back I'm just looking for a new friends so hopefully we can be

**Author** stranger_things2132 (Instagram: 59082992077)
    **Sent** 2023-07-31 23:22:54 UTC
    **Body** Hey I was wondering would you like to be a part of my girls group you can post anything you want innapropriate or not you can share what you want just no talking about boys lol

38.      Investigators also observed conversations between Stranger Things and Instagram

accounts "the_mean_pickle", "butt3rfly_princ3ss", "alexa_the_gansta", "baker.21796", "___.v.i.s.e.r.i.o.n__", "space_cats_xo", "star_d2023xi", and "preppy_1292". Stranger Things was observed communicating with each account directly and in a group chats with all of the accounts. A separate direct communication was observed between Stranger Things and Instagram user "**stevenpaul800**". During those conversations, Stranger Things did not maintain the persona of Cassie.

Conversations with "the_mean_pickle"

39. Stranger Things and Instagram user "the_mean_pickle" (hereinafter "Mean Pickle") were observed to have communicated through Instagram from June 3, 2023 to August 9, 2023.

40. On June 5, 2023 after Stranger Things sent a screen shot of the chat group "girls only [eyes emoji, purple devil emoji, purple devil emoji, sweaty face emoji, fire emoji]." Within the screenshot, Instagram user "Brookey Faith" stated, "Don't add pickle he is a kidnaper." Stranger Things and Mean pickle exchanged the following messages on June 5, 2023 and June 6, 2023, after the photo was sent:

Stranger Things: [crying laughing emoji, crying laughing emoji] wtf

Mean Pickle: It's that hunter. Watch out he doesn't fuck u over too

Stranger Things: Wait what that's not a girl?

Mean Pickle: No I mean That Roblox dripp guy tells girls we're Kidnappers

Stranger Things: Oh

Mean Pickle: So he might mess with u too

Stranger Things: Idk I'll be careful but she wanted me to kick you don't you have a girls account

28

Mean Pickle: It's fine Bella will send me everything

Stranger Things: [crying laughing emoji] ok, Hopefully sky does shit too, Sky messaged me and told me to remove her [crying emoji] so I did, Bro tell her to follow me tell her I'm nice, They seem to listen to you, Bro she's pissing me off

Based upon my training, experience and the context of the conversation, I believe Stranger Things and Mean Pickle are adult males coordinating to obfuscate their true identities from minor females.

41.     On June 6, 2023, Stranger Things and Mean Pickle exchanged the following messages:

Mean Pickle: Btw do you still have the old recordings of ryleigh or did you delete them from grec

Stranger Things: I didn't have her set to record since last night but I'll see if her old stuff is still on there if she is I'll buy her previous recordings

Mean Pickle: Nice do you still have the 2 vids from last night there?

Stranger Things: Which sucks because in order to see past recordings it's $3.99 per girl, I sent them to bella already, One sec I'm looking now to see how many recordings she has

Mean Pickle: Yeah but the first video cuts out so you can't see anything. I was wondering if you could get that in lower quality, the one where she doesn't show

Stranger Things: Oh no I deleted them but if I pay for her I'll be able to do it again

Stranger Things then sent the following photo to Mean Pickle:

29



Stranger Things: 8 past lives

Mean Pickle: Ah okay. It's fine then unless you think unlocking is worth it

Stranger Things: Eh I e wasted money on girls that don't show [crying laughing emoji] I was curious, Is there any other girl u want me to look up for you and possibly buy, I got almost $800 so moneys no object

Mean Pickle: Haha okay. She seems like a good choice I'll see if there's anyone else

Stranger Things: Sounds good, The other girl Moran that's in the group was a bit naughty yesterday but when I asked her about it she didn't know what I was talking about

Mean Pickle: Oh what did she do, That was naughty

30

Stranger Things: [Sent a screenshot of Instagram account "morganrosethomson123..."], This girl and she was grabbing and rubbing herself, But didn't show anything

Mean Pickle: Oh nice

Based upon my training and experience, I believe Stranger Things and Mean Pickle are utilizing the paid premium service of the "Grec: Recorder" application to obtain videos that were live broadcast by the minors through Instagram with the sole purpose of obtaining CSAM.

42.     On June 9, 2023, Stranger Things and Mean Pickle exchanged the following messages:

Mean Pickle: Bella is working on Starla and Macy. Maybe you can try them too

Stranger Things: I tried working on starla she won't do anything for me and the very few things that that I did get out of her was only partial nudes but she didn't show anything and it's a long story right now between her and I Bella will tell you everything I sent it screenshots of starla's and my conversation we were kind of going at it a little bit we have been ever since we first met and as for Macy f*** no not on this account

Mean Pickle: Alright haha. How is Brooke going for you?

43.     On June 13, 2023, Stanger Things and Mean Pickle exchanged the following messages:

Stranger Things: Is it possible to make soon Brooke wants to meet my sister [crying laughing emoji]

Mean Pickle: Hmm it's not letting me make a new account

31

Stranger Things: Ok I'll ask Alex, By the way butterfly princess is lightnings girls account [crying laughing emoji, blushing emoji, crying laughing emoji] I thought it was wonders

Mean Pickle: Haha nice. He's good [crying laughing emoji]

Stranger Things: Ikr I finally added him to my group well her [tongue out winking emoji]

Mean Pickle: The girls group going well?

Stranger Things: It's will be now [crying laughing emoji]

Mean Pickle: Nice [crying laughing emoji]

Stranger Things: But I'm still trying to make a new account but it won't let me [crying emoji], So is pickle playing as a girl or a boy?

Mean Pickle: Depends what they like. Usually girl tho

Stranger Things: Ok jw because if anybody says anything I'm going to say she in the group LOL I mean it's kind of obvious anyway

44. On June 16, 2023, Stranger Things sent Mean Pickle a video of Child Sexual Abuse Material (CSAM). The video appeared to be a screen recording from the user's Instagram account using the Mobizen Screen Recorder application. A description of the video is as follows

> An 11 second, full color video of a prepubescent female, approximately 8 to 10 years of age. The text "skylarleeweston to you now" was visible in the top left corner of the video. The child appeared to have set a phone or tablet to record herself. The child had blonde hair and was wearing a lime green t-shirt with a geometric pattern on the front. The child was naked from the waist down and was sitting partially cross-legged on carpet. The heel of the child's right foot was pressed against her vagina. The child manipulated her vagina with the heel of her foot and lifted her t-shirt to make the action visible on the video.

45. After the video was sent, Stranger Things and Mean Pickle exchanged the following messages:

32

Mean Pickle: Wow

Stranger Things: She's all mine bro were dating [crying laughing emoji]

Mean Pickle: Great job lol

Stranger Things: Thanks bro

46.     Stranger Things then sent a screenshot of messages exchanged with the Instagram user account "Skylar Lee Weston" (Hereinafter "Minor Victim 2"). Stranger Things was believed to be the user exchanging messages with Minor Victim 2. The messages exchanged were as follows:

Minor Victim 2: It sounds weird but nice

Stranger Things: Could you show me [Two hearts emoji]

Minor Victim 2: I mea you can't really see when I do it because it's my foot

Stranger Things: Well I mean you can take a video if you feel comfortable just prop your phone up, Sorry [eyes closed emoji]

Minor Victim 2: It's okay I no you just try to be nice

Stranger Things: I used a marker before [crying laughing emoji]

Minor Victim 2: [Sent an image] Why

Stranger Things: Cause it felt better

Minor Victim 2: Haha can you do it right now if your comfortable with it I'm not forcing you to

Stranger Things: I can yeah one sec

47.     Stranger Things commented to Mean Pickle, "She's horny AF [sideways crying laughing emoji]." Mean Pickle responded, "Damnnn [crying laughing emoji]." Stranger Things

33

sent a screenshot of the continued conversation with Minor Victim 2. The context of the conversation implied that Stranger Things sent Minor Victim 2 a video of a child inserting a marker into her vagina.

48. On June 18, 2023, Stranger Things messaged Mean Pickle, "Wanna know who I'm using for a boys catfish?" Mean Pickle responded, "Sure haha." Stranger Things then sent a screenshot image of an 8 to 11 year-old boy with the message, "Found his account on here so started taking pics." Mean pickle responded, "Nice how is it working out for you."

49. On June 25, 2023, Stranger Things and Mean Pickle exchanged the following messages:

Stranger Things: Yeah I'm not going to lie I'm on paper I am a registered sex offender I'm not going to lie, But I was falsely accused it never happened

Mean Pickle: That sucks man

Stranger Things: Yeah well this just stays between you and us everyone in the group already knows about me and they're not mad

Mean Pickle: Alright. What's it like being registered. Are there like stuff u can't do

Stranger Things: As of right now I can basically do anything

50. On July 10, 2023, Stranger Things sent Mean Pickle two images of screenshots depicting an apparent Instagram communication between Stranger Things and Instagram user "br.ooklyn2166" (Hereinafter "Minor Victim 3"). Within the conversation, Stranger Things encouraged Minor Victim 3 to download the Telegram application in order to receive a "hair brush" video. Minor Victim 3 was unable to download the application because she needed to obtain permission. Stranger things then stated, "Oh that's understandable I'll send all the naughty videos

34

I have lol if you want me to." The screenshots indicated that Stranger Things subsequently sent six videos. The conversation ended with Minor Victim 3 asking, "Will u be my online girlfriend" and Stranger Things replying, "Ofc [two heart emoji]."

51.     Following the screenshots of the conversation with Minor Victim 3, Stranger Things sent five images of screen recordings using the Mobizen screen recording application. Each of the recordings included text in the upper left corner of the image indicating Minor Victim 3 sent the image to Stranger Things. The first image was a still image depicting a close-up view of a child's vagina. The second image was a 26 second selfie-style video of an 8 to 11 year-old naked female laying in a bed. The female maneuvered the camera to show her unclothed chest and a close-up of her vagina. The third image was a 22 second video that appeared to be an extension of the second video that focused multiple times on the child's vagina and anus. The fourth video depicted the same child removing a pair of gray shorts and briefly dancing naked. The fifth video was consistent with the definition of CSAM and is further described as follows:

> A full-color video, approximately one minute and one second in length, depicting a white female, approximately 8 to 11 years old. The child had no pubic hair and lacked breast development. The child appeared to be on a bed with a cartoon of a white horse with multi-colored hair on the wall in the background. The fully naked child maneuvered her body so her vagina, chest and face were visible in the image. The child manipulated her vagina with her hand.

52.     After sending the above images, Stranger Things and Mean Pickle exchanged the following messages:

> Stranger Things: I sent everything on telegram, Even stuff from lives when I was asleep

> Mean Pickle: Niceee thanks

> Stranger Things: No prob

35

53.     On July 13, 2023, Stranger Things sent an image to Mean Pickle depicting a screen recording using the Mobizen screen recording application. The image included text in the upper left corner of the image indicating the image was originally sent to Stranger Things by Instagram user "isabellerose953" (Herinafter Minor Victim 4). The recording was consistent with the definition of CSAM and is further described as follows:

> A full-color selfie-style video, approximately 50 seconds in length, depicting a white female, approximately 8 to 11 years old. The child reclined her body in the video so she was visible from below her nose to her inner thigh. The child was wearing a purple zip-up long sleeve shirt with a white emblem on the left breast and yellow, red and orange stripes visible on the left shoulder. The child was not wearing underwear and her naked vagina was visible. The child maneuvered the video to focus on the vagina. She then digitally penetrated and manipulated her vagina.

54.     On July 16, 2023, Stranger Things sent Mean Pickle screenshots of conversations between Stranger Things and Minor Victim 1, described in paragraph 32. Stranger Things then sent a two-second video. The video depicted a child pulling her underwear away from her waist, allowing for her naked pubic region to be visible. The child lacked pubic hair. Stranger things then stated, "Viv is horny AF rn she's watching lesbian porn." Stranger Things then sent an image consistent with the definition of CSAM, further described as follows:

> A full-color selfie-style video, approximately 32 seconds in length, believed to depict 9 year-old Minor Victim 1. The video depicts a close-up view of the female child's vagina with her legs and pink bedding visible in the background. The child inserted a black and red marker with "Magnetic Erasable Whiteboard marker" written on it, into her vagina. The child had chipped, light green polish on her thumbnail.

55.     On July 17, 2023, Stranger Things messaged Mean Pickle, "Well I recorded Cassie's new video I crapped it and edited I'm going to post it go like it LOL." Based upon my training and experience, I believe Stranger Things obtained a video of an actual child using a screen recorder. Stranger Things then cropped and edited the video so identifying marks of the screen

36

recorder were not visible in the video. Stranger things then posted the video to an Instagram account in an effort to pass himself off as Cassie to actual female children.

56. On July 21, 2023, Stranger Things and Mean Pickle exchanged the following messages:

Stranger Things: Hey do you have any normal pics of Cassie I don't have my other phone on me and I'm out of town by the way her and I are officially done, Plus I won't be home till next sunday

Mean Pickle: I'll check, And what happened?

Stranger Things: Long story also I snapped at Brook tonight as well she didn't message me back but she was messaging everything to Cassie she told Cassie to block me so I ended up blocking Cassie first but there was a lot of s*** that went on Alex has a screenshots on his account if you want to read them

Mean Pickle: Alright bro

Stranger Things: Well I'm fucked Cassie found out I'm pretending to be her

Mean Pickle: How did that happen

Stranger Things: Because she made sienna a Roblox account and ig she's been reading my messages, She can't find me on here though because I blocked all her accounts and if she makes a new account she'll never find me because I sent it to block all accounts even new accounts that are made, I'm going to continue being her for as long as I can I know this will count will go down eventually but at least it's working

57. On July 31, 2023, Stranger Things and Mean Pickle exchanged the following messages:

37

Stranger Things: Cheers bro 30 year old scotch here's to all the b******** we deal with

Mean Pickle: Hell yeah. Cheers

Stranger Things: It's either this or weed [crying laughing emoji]

58.     On August 1, 2023, Stranger Things sent Mean Pickle four images depicting screen recordings using the Mobizen screen recording application. Each of the images included text in the upper left corner of the image indicating the video was originally sent to Stranger Things by Instagram user "denisewyrick" (Hereinafter Minor Victim 5). The images appeared to have been taken in succession, as the child was wearing the same t-shirt in each image. The final image was consistent with the definition of CSAM and is further described below:

A full-color video, approximately 32 seconds in length, depicting a white female, approximately 8 to 11 years old. The child reclined sat on the ground in a bathroom. The child was light blue long sleeve t-shirt with a brown and orange design meant to look like a turkey, including the words, "Gobble, Gobble, Slam" and black shorts pulled down to her knees. The child's full body was visible. The child was not wearing underwear and her naked vagina was visible. The child manipulated her vagina. The video cut to a close-up of the child touching her nipple. The video ended with a selfie-style photo of the child wearing the same t-shirt outside in front of a vehicle.

59.     On August 3, 2023, Stranger Things sent two screenshots depicting an exchange of messages between Stranger Things and Minor Victim 5. The image included the following messages:

Stranger Things: Ok what kinds of stuff are you into

Minor Victim 5: Private parts, i am sorry

Stranger Things: Ok one sec I'll brb I'll look some up

Minor Victim 5: Ok

Stranger Things: When I send them to you I want you to screenshot whatever you like but make sure that you delete them out of your phone after you see them

38

Minor Victim 5: Ok, i don't know how

Stranger Things: Ok then just vies them and pick which one you like and can do

Minor Victim 5: ok

Minor Victim 5: i like the last onn, now what do i do

Stranger Things: [winking tongue out emoji] what ever you do i will do tomorrow for you

Minor Victim 5: ok

Stranger Things: Ok one sec

Minor Victim 5: ok

Stranger Things: [Sent two photos not visible in the conversation]

Minor Victim 5: [Sent photo not visible in the conversation]

Stranger Things: Do you have to use the bathroom?

Minor Victim 5: yes

Stranger Things: Maybe you can pee for me

Minor Victim 5: ok do you want me to send a video

Stranger Things: Sure

Minor Victim 5: ok

Stranger Things then commented to Mean Pickle, "She's a super freak." Based upon my training and experience and the context of the conversation, I believe Stranger Things sent an image of CSAM or pornography to Minor Victim 5 in order to gain a reciprocal image of Minor Victim 5 in response.

<u>Conversation with "butt3rfly__princ3ss"</u>

60.     Stranger Things and Instagram user **"butt3rfly__prin3ss"** (hereinafter "Butterfly") were observed to have communicated through Instagram from June 13, 2023 and August 9, 2023.

61.     On June 13, 2023, Stranger Things and Butterfly exchanged the following messages:

Stranger Things: If you want you can add some girls to the group too, Just comment down there and aske me if it's okay LOL I need some action in this group

Butterfly: Np. I feel like we need naughty girls.

Stranger Things: I know we do lol I'm running dry bro haven't done shit in almost a week, By the way when you comment on the group say Cassie LOL

Butterfly: [thumbs up emoji, thumbs up emoji], Sounds good Cassie

Stranger Things: [crying laughing emoji], I was going to tell you if ou want to add any girls just do it after you ask them if they want to be part of a girls group but do not ask in the group because then everybody's gon got want to do it and I don't want them adding fake accounts

Butterfly: Yeah dw I'm not gonna add anyone unless shes 100% naughty af. Lol

Based upon my training and experience, Stranger Things and Butterfly were coordinating to identify minor females on Instagram and deceive them into sending naked and sexual images of themselves to groups created by Stranger Things.

62.     On June 16, 2023, Stranger Things messaged Butterfly, "[crying laughing emoji] she's using her foot on her pussy for masturbation [crying laughing emoji] god I love this girl." Based upon the context of the conversation, I believe Stranger Things was referring to a previously

40

described CSAM video of Minor Victim 2, sent to Mean Pickle on the same date and further described in paragraph 44.

63. On June 16, 2023, Stranger Things sent Butterfly a recording of a video posted by Minor Victim 2. The text overlay of the video indicated it was posted to the Instagram group "[heart emoji] girls only [heart emoji]." The video appeared to have been recorded by Stranger Things using the Mobizen screen recording application. The video was consistent with the definition of CSAM and is further described as follows:

> A full-color video, approximately 11 seconds in length, believed to depict Minor Victim 2, an 8 to 11 year-old female. The video was zoomed in on the vagina of the child. The child lacked pubic hair. Striped, purple sheets were visible in the background. The child manipulated her vagina in the video. The perspective of the video indicated the child was recording the video.

64. On June 18, 2023, Stranger Things and Butterfly exchanged the following messages:

> Butterfly: Hm well maybe we can scavenge. Give it a cpl days. But I'll just say "I'm making a naughty girl group for whoever is interested" and see who bites. In the mean time try and get as many girls as possible. If anything make one big girl group. A clean one. Then bring n an alt and say something like "im naughty af who wants to join me?". Bait. And again let's see who bites. Your always going to be bringing in girls who are more naughty than others. That will kill the group. Gotta make 2. Naughty and nice.
>
> Stranger Things: Yeah that's true yeah I'll give it a couple days just to think about it and I will let you know if and when I decide to make it as of right now you are my only hope well you and pickle, You are like my obi wan [crying laughing emoji]

41

Butterfly: Dw. Like I said just add as many girls as you can. Then in a cpl days you can add my girl alt. I have another one for something like this. And I'll make a group for naught girls only. But rn it doesn't look like any of these ones are really naughty. That lilybunny is but I never talk to her.

Stranger Things: Okay so do you want me to just make a new group and then add every girl that's on my list

Based upon my training and experience, Stranger Things and Butterfly were discussing methods to develop Instagram groups that were more successful at producing CSAM, including adding additional "alternative" or fake accounts.

65.    On July 8, 2023, Stranger Things and Butterfly exchanged the following messages:

Stranger Things: Did you happen to record Ariel today I guess she was showing her body off

Butterfly: Fml everyone is saying that [annoyed emoji]

Butterfly:

Butterfly: That's what I got, And I can't buy the previous lives

Stranger Things: Is that from today

Butterfly: Lol yeah man today's the 8th

42

Stranger Things: Shoot ok well send it if you can I have to pay for another subscription myself, That's why it didn't record for me

Butterfly: Apparently it happened right before that live I have there

Stranger Things: Fuck

Butterfly: Yeah I didn't get it

Stranger Things: Well I'll have to see what I can do but I hope Baker had it recorded

Butterfly: I used to have her on auto record too, But she never did anything, Always with those roblox lives

Stranger Things: I do but with my subscription ending I have to do it manually now which takes up tine

Butterfly: Go figure I take her off and she does shit

Stranger Things: I know it sucks

Based upon my training and experience, I believe Stranger Things and Butterfly, coordinate with others in order to obtain CSAM from the Grec: Recorder application.

66.     On July 10, 2023, Stranger Things sent Butterfly a link to the Instagram profile of Minor Victim 3. Stranger Things and Butterfly then exchanged the following messages:

Stranger Things: She's real and she's from Canada

Butterfly: Lol don't say that I might have to go out and find her [cyring lauging emoji]

Stranger Things: Are u from Canada too

Butterfly: Uh yeah dude. I'm pretty sure everyone knew that though lol. [thinking emoji] [sideways crying laughing emoji]

Stranger Things: Yeah I forgot LOL Alex is from there too

43

Butterfly: [sideways crying laughing emoji] yeah I remember

Stranger Things: What is it with you Canadians no offense [crying laughing emoji], I can ask her what part of Canada she lives in one sec, She said Ontario

67. On July 10, 2023, Stranger Things sent screen captures of messages he exchanged with Minor Victim 3. Within the messages, Stranger Things appeared to send multiple videos to Minor Victim 3. After sending the screen captures, Stranger Things and Butterfly exchanged the following messages:

Butterfly: Damn look at all those vids lol [closed eye laughing emoji], She got a lot from ya

Stranger Things: Yup now it's her turn [crying laughing emoji]

Butterfly: Thought it was supposed to be the other way around [sideways crying laughing emoji]

Stranger Things: That's what I thought but maybe they will help her cum I told her she can save them if she wants lol thanks Cassie [crying laughing emoji]

Based upon my training and experience, I believe Stranger Things sent CSAM videos to Minor Victim 3 to encourage her to provide CSAM videos of herself in return. I believe the videos sent by Stranger Things depicted the real child that he uses as his Instagram persona.

68. On July 10, 2023, Stranger Things sent the same series of images and videos depicting Minor Victim 3 that were also sent to Mean Pickle on the same date. The videos included a video that was consistent with the definition of CSAM and previously described in paragraph 51.

69. On July 11, 2023, Butterfly sent the following message to Stanger Things, "Remix it, Then edit it. Put like a hi or a sticker in the top corner, Then there should be an option to save real to drafts. When I do that it also saves to my camera roll so I have it ok my device." Based upon my training, experience and the context of the conversation, I believe Butterfly was instructing Stranger Things on a method to save CSAM to a physical device, such as a phone, tablet or computer. I further believe Stranger Things and Butterfly were discussing a method of editing screen recordings to make videos appear more convincing that they were taken by a child.

70. On July 13, 2023, Stranger Things sent the following message to Butterfly, "Thank God I have all these pictures of Cassie without them I would be screwed."

71. On July 13, 2023, Stranger Things sent Butterfly a video of Minor Victim 4. Stranger Things sent the same video to Mean Pickle on the same date. The video was consistent with the definition of CSAM and previously described in paragraph 53.

72. On July 13, 2023, Stranger Things sent a screenshot of a conversation in which a minor female declined to follow Stranger Thing's account. Stranger Things and Butterfly then exchanged the following messages:

Stranger Things: Seriously [annoyed emoji]

Butterfly: Some of these girls just need a dick in their mouth to shut them up [sideways crying laughing emoji]

Stranger Things: [crying laughing emoji]

73. On July 13, 2023, Stranger Things sent Butterfly a video of Minor Victim 4. The video was consistent with the definition of CSAM and is further described as follows:

A full-color video, approximately 22 seconds in length, believed to depict Minor Victim 4, an 8 to 11 year-old female. The video was zoomed in on the vagina of the child. The child

45

lacked pubic hair. A pink article of clothing appeared to have been pulled up, so the child's vagina was visible. The child manipulated her vagina in the video. The perspective of the video indicated the child was recording the video.

74. On July 16, 2023, Stranger Things messaged Butterfly, "Viv is horny AF rn she's watching lesbian porn rn." Stranger Things then sent screenshots of conversations between Stranger Things and Minor Victim 1, previously described in paragraph 12. Stranger things then sent a video to Butterfly. Stranger Things sent the same video to Mean Pickle on the same date. The video was consistent with the definition of CSAM and previously described in paragraph 54.

75. On July 16, 2023, Stranger Things messaged Butterfly, "Well Alex message me and said that Cassie wants to be friends again and I would like to but I kind of can't with this account so is it possible that maybe you can make me a backup account or something and I'm going to be making a new group but I'm not adding live or Kenzie because I know that Kenzie's part of it too and yeah he messaged me yesterday calling me a pedophile and everything else." Based upon my training and experience, I believe the message represents efforts by Stranger Things, Butterfly, and others to use multiple fake accounts to deceive groups of minor females into producing CSAM.

76. On July 17, 2023, Stranger Things and Buttefly exchanged the following messages:

Stranger Things: But I'm bored so any girls you want me to look up

Butterfly: Ah damn. And not really [expressionless emoji] most I'm talking to on live then leaving.

Stranger Things: Oh well I sent you one of brantley's that she recently did that I forgot about that I had plus a few from Cassie I'm talking to her on telegram again

46

Butterfly: Im going through my list here and I'm noticing a lot of these girls have me blocked now. Or banned. Got a lot of "Instagram users" [annoyed emoji], I'm gonna have to update

Stranger Things: Damn well if you come across to me that you want me to pay for just let me know I have enough money to do so

77. On July 17, 2023, Stranger Things and Butterfly exchanged the following messages:

Stranger Things: Did you see that what's her name left the group

Butterfly: Yeah she's a bitch. Don't worry about it, She's always been like that

Stranger Things: Well she was messaging me right after she was calling me a pedophile and everything else I said I am only 10 years old I says I am not a pedophile she says not according to over a dozen people

Butterfly: According to who tho wtf

Stranger Things: I don't know she wouldn't tell me she ended up blocking me

Butterfly: Well she's a bitch like I said

Stranger Things: Yeah it's no wonder why she can never get laid, Maybe that's the reason why she's a cutter

78. On July 17, 2023, Stranger Things and Butterfly exchanged the following messages:

Stranger Things: But it's okay now that we get rid of her we can have some fun, I'm going to put a comment in the group I want you to answer to it, I'm gonna wait till others see it first [crying laughing emoji], I'm waiting for Cassie to send me a picture

47

Butterfly: [thumbs up emoji]

Stranger Things: Okay they're starting to see it so Cassie needs to hurry up

Butterfly: What do you want me to call you? Cj or Cassie or?

Stranger Things: Cassie

79. On July 17, 2023, Stranger Things messaged Butterfly, "I don't know not unless they all know that I'm using Cassie as catfish." Based upon my training and experience, I know the term "catfish" to mean a person that uses fake online personas to deceive others, often for romantic or sexual purposes.

80. On July 18, 2023, Stranger Things messaged Butterfly, "I'll be surprised if some of these girls in the next group chat leave quite honestly I really don't blame them I know that they don't want to deal with it and I know that you and I don't want to deal with this either I wish Instagram was a safer place bro but it's a dangerous game that we are playing and it will always be."

81. On July 18, 2023, Stranger Things and Butterfly Princess exchanged the following messages:

Stranger Things: Save this for me please, She's not wearing underwear, I tried to do it like you showed me but for some reason my phone's not letting me save videos

Butterfly: You gotta actually put it to your profile so it saves. Then delete it right away

Stranger Things: Yeah that's a little risky [crying laughing emoji] but I'll try which means that I have to post it to my page, Okay I did what yu said but it

48

won't let me save it it just posted it but all it says is share and edit, Maybe it's just something for an iPhone I don't know

Butterfly: Yeah that's why I do it on an alt where I don't have any followers

Stranger Things: True which means I'll have to do it on my backup account

82. On July 22, 2023, Stranger Things messaged Butterfly, "Well I'm fucked Cassie found out I'm pretending to be her." Butterfly responded, "I thought she already knew? Lol". Strang Things responded, "No".

83. On July 31, 2023, Stranger Things messaged Butterfly, "...by the way Cassie sent me a whole shitload of stuff on telegram she just magically started messaging me."

84. On August 1, 2023, Stranger Things messaged Butterfly regarding Minor Victim 5. He stated, "That Denise girl I added she's freaky, She said send video for video lol anything I do she'll do." Stranger Things then sent three videos of Minor Victim 5, including a 13 second video in which Minor Victim 5 manipulated her vagina. Butterfly responded, "She's got a nice little pussy." The following day, Stranger Things sent Butterfly a fourth video of Minor Victim 5. The video was consistent with the definition of CSAM and was further described in paragraph 58.

85. On August 2, 2023, Stranger Things sent Butterfly screenshot of an email that appeared to be from Meta Platforms, Inc. Law Enforcement Response Team. The message included the following information: Meta Platforms, Inc. "received legal process from law enforcement seeking information about your account, and produced data as required by law. The legal process was accompanied by an order that prohibited us from disclosing information about the case until a specific time had expired and we were legally required to produce the records specified in the demand."

49

86. Stranger Things and Butterfly exchanged the following messages regarding the email from Meta Platforms, Inc.:

Stranger Things: This is in my email should I be concerned

Butterfly: Idk I've never got those. And it could be fake [shrugging shoulders emoji]

Stranger Things: I hope so I can't afford to go to prison rn lol

87. On August 3, 2023, Stranger Things messaged Butterfly, "I'm sending Denise cp and she's enjoying it [crying laughing emoji]." Stranger Things then sent Butterfly a screenshot of a conversation with Minor Victim 5 that he also sent to Mean Pickle on the same date. Based upon my training and experience, I believe Stranger Things was indicating that he sent child pornography to Minor Victim 5.

88. On August 8, 2023, Stranger Things messaged Butterfly, "I need more of Cassie bro I'm running out of a lot of stuff I need Alex to do his job and get me more."

89. On August 8, 2023, Stranger Things and Butterfly exchanged the following messages regarding a group chat titled, "Preppys lifestyle [purple fingernails emoji] Pedicure Makeup Style":

Stranger Things: Is she gone now? I removed her, Yes she knew what was happening she knew what was going to happen she's the one that made this decision to act like a f******fool, Don't feel bad I'm laughing too she's the one that started this and I'm going to make sure that her video that she did for me last night gets everywhere, I have them for you I sent them to you start sending them to people, I don't care if my name is shown on the video or not, But it's okay if she does anything on live I have her recording, And them I'm going to make sure that her videos get spread around the internet too

50

Butterfly: [crying laughing emoji]

Stranger Things: Sorry to say this but you f*** with me this is what's going to happen [crying laughing emoji] I told you I'm just way to f****** good at this s***

Conversation with "alexa_the_gansta"

90.     Stranger Things and Instagram user "alexa_the_gansta" (hereinafter "Gansta") were observed to have communicated through Instagram from June 3, 2023 and August 9, 2023.

91.     On June 6, 2023, Stranger Things and Alexa exchanged the following messages:

Gansta: Hey are you on, I added a new account to the group. Can you add that to the girls group

Stranger Things: What is with you and the gangsta [crying laughing emoji] I doubt they'll believe it

Gansta: [crying laughing emoji]

Stranger Things: I will add you but will see how this goes Mr [duck emoji]

Gansta: Sounds good [crying laughing emoji]

Stranger Things: Do you have an album for that

Gansta: It's my new Bella account. Other got banned

Based upon my training, experience and the context of the conversation, I believe Stranger Things and Gansta were referring to a collection of images of a minor female child that could be used to create a fake Instagram persona, including naked and sexual images, when discussing the term "album".

92.     On June 16, 2023, Stranger Things sent multiple images and screen captures of conversations with Minor Victim 2 to Gansta. Stranger Things then stated, "She's using her foot

51

to masturbate [crying laughing emoji]." Gansta responded, "[crying laughing emoji] [crying laughing emoji]." Stranger Things stated, "God I love this girl," then sent a video of Minor Victim 2. The video was consistent with the definition of CSAM and previously described in paragraph 44.

93. On June 17, 2023, Stranger Things and Gansta exchanged the following messages:

Stranger Things: Found a young boys account if you want catfish pics

Gansta: Sure u got a screenshot of how he looks

Stranger Things: [Sent link to deactivated Instagram account], There's a shit ton

Gansta: Nice he got any more inappropriate stuff

Stranger Things: [crying laughing emoji] ikd [neutral face emoji]

Gansta: Need it for the girls

Stranger Things: Lol go for it I was going to but eh

Gansta: I don't need it now so u can use it but it's pretty good

Stranger Things: Ok I'll use it for my backlash account lol, Just gotta clean a lot of storage first

Stranger Things then sent multiple selfie-style images of the same 9 to 12 year old boy. Stranger Things and Gansta decided on the name "Lucas" for a fake boy's Instagram account. Stranger Things then sent a screenshot for Instagram username "neverendingnightmare00", including a display name of Lucas. The profile picture was one of the images that Stranger Things sent in the conversation.

94.     On June 19, 2023, Stranger Things and Gansta exchanged the following messages:

Stranger Things: One more thing never trust anybody with your passwords because you never know what could happen

Gansta: You for sure, A split account with other people is fine but don't give any personal account

Stranger Things: Oh no that's why I changed on my passwords right after she blocked me the first time

Gansta: Yeah the only good thing was cassie can send voice messages for you but it's not worth the risk

Stranger Things: I agree, Either Cassie blocked me from all of her accounts or she deactivated the other cause I only had the passwords for that 1

95.     On July 10, 2023, Stranger Things sent Gansta a link to the Instagram account of Minor Victim 3. Stranger Things then stated, "She's real and she's from Canada lol" and sent screenshots of communications with Minor Victim 3 and videos of Minor Victim 3. The videos of Minor Victim 3 were consistent with the videos Stranger Things sent Mean Pickle and Butterfly on the same date. One of the videos was consistent with the definition of CSAM and previously described in paragraph 51.

96.     On July 10, 2023, Stranger Things and Gansta exchanged the following messages:

Stranger Things: Is it just me or did I find my game [crying laughing emoji] I'm on a roll so either I'm making all these girls lesbians or they already were

Gansta: I think it's you. Ur just too good at it [crying laughing emoji]

Stranger Things: Hola quit being such a baby I can give you some pointers or you can just read the messages and go from there [crying laughing emoji]

Gansta: Sounds good [crying laughing emoji] anything helps lol

Stranger Things: Like I said and I always said in order to be a girl you have to act and think like them

97.     On July 13, 2023, Stranger Things sent Gansta a video of Minor Victim 4. The video was consistent with the definition of CSAM and was previously described in paragraph 53. Stranger Things sent the same video to Mean Pickle and Butterfly on the same date.

98.     On July 16, 2023, Stranger Things sent Gansta a video of Minor Victim 1. The video was consistent with the definition of CSAM and was previously described in paragraph 54. Stranger Things sent the same video to Mean Pickle and Butterfly on the same date. Shortly after sending the video, Stranger Things messaged Gansta, "Bro if we can get her to do a live on a backup account like a new one I'll be happy and I'll share the account with you if she does."

99.     On July 17, 2023, Stranger Things messaged Gansta, "Yeah and it's because Kayley send me a video but forgot to save it of Josie when live and I guess she was calling me a pedophile she named my account she was sharing picture and everything else oh yeah it's bad and I mean really bad, So which means whoever finds the real Cassie I'm f*****."

100.    On July 19, 2023, Stranger Things and Gansta exchanged the following messages:

Stranger Things: She wants sienna to do a video and I don't have a video so what I'm going to do is I'm going to send everything that I get and I'm going to hate to do it but I'm going to deactivate my telegram account and make a new one and just add all of you guys again because if I back out she's going to be pissed

Gansta: Alright

Stranger Things: Go save the videos before I deactivate it because if I deactivate it you're not going to be able to see them, So let me know when you do it

Gansta: Sounds good

Stranger Things: Preferably sometime within the next 5 minutes lol

Gansta: Okay [crying laughing emoji]

Stranger Things: If you are following Baker and lightning on there send the videos and pictures to them as well

Gansta: Kk and I saved them now

Stranger Things: Kk

Based upon my training and experience, I believe Stranger Things and Gansta were coordinating to save a collection of images related to specific children, including CSAM videos, for the purposes of posing as those children in future Instagram accounts and to maintain the CSAM for their own sexual purposes.

101. On July 23, 3023, Stranger Things and Gansta exchanged the following messages:

Gansta: I'm sure that pickle guy will love all ur vids watch out [crying laughing emoji] [crying laughing emoji]

Stranger Things: [crying laughing emoji] he's still a perv, He can show me a pickle I'll show him anything [cyring laughing emoji], S*** I forgot he can see our messages, So are you two roommates or just good friends

Gansta: Good friends

Stranger Things: Oh lol well the way I see it if I run into trouble I know you and Kevin will back me up you guys always have this is why I said before that if anything happens I would not turn my back on you or him no matter what happens you two will always be there for me and that's that

Gansta: Appreciate it bro

Stranger Things: Of course us creeps got to stick together somehow [crying laughing emoji]

102.    On August 1, 2023, Stranger Things sent an image to Gansta. The image depicted a minor female sitting on a toilet. Minor Victim 5's username overlayed the upper left-hand corner of the image. After sending the image, Stranger Things stated, "She seems easy, She's 8." Gansta responded, "Nice she's cute."

103.    On August 2, 2023, Stranger Things sent Gansta four images of Minor Victim 5. Stranger Things sent the same images to Mean Pickle and Butterfly around the same date. The images included a video that was consistent with the definition of CSAM and was further described in paragraph 58.

Conversation with "baker.21796"

104.    Stranger Things and Instagram user "baker.21796" (hereinafter "Baker") were observed to have communicated through Instagram from June 4, 2023 and August 9, 2023.

105.    On June 4, 2023, Stranger Things and Baker exchanged the following messages:

Baker: Any word on sky's nude?

Stranger Things: Not yet I haven't talked to pickle he's been busy and so have I but I'll message him later

Baker: Okay, Is "Cassie" getting anywhere with her? [crying laughing emoji]

Stranger Things: No remember she reported my account plus she blocked the original Cassie

Baker: I was talking about your Cassie account

Stranger Things: Oh no not yet this was the Cassie account but I changed everything I'm still Cassie though

Baker: Oh okay, She seems easy...[crying laughing emoji]

Stranger Things: You're not kidding bro I can't believe that she's actually buying it but at least she said that she'll follow me back

106.    On June 4, 2023, Stranger Things and Baker exchanged the following messages:

Baker: Ask trinity if she'll send you a hairbrush video

Stranger Things: I did in my old account she said no

Baker: Damn what about a fingering vid?

Stranger Things: Maybe lol I don't know right now I need to go get a pack of smokes

Baker: Okay lol. I have to go and get a new vape too. [crying laughing emoji]

107.    On June 8, 2023, Stranger Things and Baker exchanged the following messages:

Stranger Things: But like I said if they do anything don't worry I'm going to send it to you

Baker: Just leave it be so if they end up getting naughty on live you'll still see it anyway [crying laughing emoji]

Stranger Things: Yeah true but it's not the same [crying emoji]

57

Baker: It's even better, you don't get the comments obstructing your view and you don't have to keep your phone occupied with watching it live [crying laughing emoji]

108. On July 10, 2023, Stranger Things sent Baker screenshots of communications with Minor Victim 3 and videos of Minor Victim 3. The videos of Minor Victim 3 were consistent with the videos Stranger Things sent Mean Pickle, Butterfly and Gangsta on the same date. One of the videos was consistent with the definition of CSAM and previously described in paragraph 51. After receiving the videos, Baker stated, "Nice, You should see if she'll send you a hairbrush vid too [crying laughing emoji]."

109. On July 13, 2023, Stranger Things and Baker exchanged the following messages:

Baker: Amelia is live right now if you want to try to get her to message you [crying laughing emoji]

Stranger Things: Eh I'll pass I've seen her naked enough honestly it's kinda old [crying laughing emoji]

Baker: I haven't seen enough yet [sideways crying laughing emoji]

Stranger Things: [eye roll emoji] [forehead slap emoji], There's plenty of pussy around bro move one [crying laughing emoji]

110. On July 16, 2023, Stranger Things sent Baker a video of Minor Victim 1. The video was consistent with the definition of CSAM and was previously described in paragraph 54. Stranger Things sent the same video to Mean Pickle, Butterfly, and Gansta on the same date.

111. On July 25, 2023, Stranger Things and Baker exchanged the following messages:

Stranger Things: Remember blue girl win there's a video sending to you on telegram of her

58

Baker: Nice. Where'd you get that?

Stranger Things: [smirking emoji] hell somebody shared it in a group that I'm in

Baker: Oh nice

Stranger Things: I wish she would do more like that

Baker: Any other goodies in that group?

Stranger things: Not really just old school CP

112.     On August 1, 2023, Stranger Things sent an image to Baker. The image depicted a minor female sitting on a toilet. Minor Victim 5's username overlayed the upper left-hand corner of the image. After sending the image, Stranger Things stated, "She seems easy, She's 8."

113.     On August 1, 2023, Stranger Things sent Baker four images of Minor Victim 5. Stranger Things sent the same images to Mean Pickle, Butterfly, and Gansta around the same date. The images included a video that was consistent with the definition of CSAM and was further described in paragraph 58.

Conversation with "stevenpaul800"

114.     Stranger Things and Instagram user "stevenpaul800" (hereinafter "Steven Paul") were observed to have communicated through Instagram from July 18, 2023 and August 2, 2023.

115.     On July 18, 2023, Stranger Things sent Steven Paul a screenshot of Instagram user account "rbx_ol" (hereinafter "Minor Victim 6"). The screen capture included non-English characters and a gallery of videos depicting Minor Victim 6, a white female, approximately 8 to 11 years old, wearing a short-sleeve pink shirt with a pattern of white hearts. Minor Victim 6 had her hair wrapped in a towel. Stranger Things then sent Steven Paul a video that was consistent with the definition of CSAM and was further described below:

59

A full-color video, 10 seconds in length, appearing to depict Minor Victim 6 taking a selfie-style video. Minor Victim 6 was wearing a short-sleeve pink shirt with a pattern of white hearts. The victim's hair appeared to be wet. The camera was maneuvered to depict a close-up view of Minor Victim 6's vagina. Minor Victim 6 then manipulated her vagina with her fingers.

Steven Paul then stated, "These girls are hot thanks."

<u>Conversation with multiple subject accounts</u>

116. Stranger Things communicated with multiple Instagram users believed to be involved in or benefiting from the exploitation of minors. Subject accounts included in the communications with Stranger Things were "___.v.i.s.e.r.i.o.n__" (Hereinafter "Viserion"), "space_cats_xo" (Hereinafter "Space Cats"), Baker, "star_d2023xi" (Hereinafter "Star"), Mean Pickle and Gansta were observed to have communicated through Instagram from June 28, 2023 and July 23, 2023. Past participants of the group were listed to include Butterfly and "preppy_1292".

117. On July 6, 2023, the following messages were exchanged in the group:

Viserion: My tele is aydynj00

Stranger Things: Sounds good I'll send everything I've gotten over the last few days

Viserion: I got a short vid recorded tonight from buzzcast suprisingly that i can send once i have time to edit

118. On July 8, 2023, the following messages were exchanged in the group:

Stranger Things: Who was it

Mean Pickle: Ariel. Apparently she was showing her pussy

Stranger Things: Well whoever it is I think I might have her recorded, I think, Take a pic of her account please

60

Mean Pickle: [Sent an image of user account "arielandaria" with images depicting an 8 – 11 year old female]

119. On July 8, 2023, Stranger Things sent the group a video of Minor Victim 4. The video was consistent with the definition of CSAM and was previously described in paragraph 53. Stranger Things sent another video of Minor Victim 4 a short time later. The video was consistent with the definition of CSAM and was previously described in paragraph 73.

120. On July 16, 2023, the following messages were exchanged in the group:

Stranger Things: [grinning emoji] [grinning emoji] go look at my account like my latest video LOL and tell me if my account looks official now, I think I did a good job on it, I'm also going to be sending videos to you guys on telegram

Mean Pickle: Looks good

Stranger Things: So next time I hear somebody say that I'm fake or decide to call me a pedophile I'm going to follow them just purposely, Just to have some fun, I tell you it's a lot of work editing and cropping her videos but it's worth it

Communication with Minor Victims

121. Stranger Things and Minor Victim 4 were observed to have communicated through Instagram from July 13, 2023 to July 14, 2023. Minor Victim 4 sent approximately 7 attachments during the communication. The images associated with the attachments were not imbedded in the conversation.

122. Stranger Things and Minor Victim 5 were observed to have communicated through Instagram from August 3, 2023 to August 9, 2023.

61

123.    On August 4, 2023, Stranger Things and Minor Victim 5 exchanged the following messages:

Stranger Things: Hi [smile face emoji] I'm Cassie

Minor Victim 5: hi my name, bella

Stranger Things: Hi bella nice to meet you [smile face emoji], I'm 10 from arizona

Minor Victim 5: hi nice to meet you too cassie, i'm 9 from Tennessee

Stranger Things: Nice [smile face emoji] well it's nice to meet someone who is my age

124.    On August 7, 2023, Stranger Things and Minor Victim 5 exchanged the following messages:

Stranger Things: I added you to a girls only private group chat it's a naughty group post anything, Just so you know we've all been posing nudes in the group you can too

Minor Victim 5: ok

125.    On August 9, 2023, Stranger Things and Minor Victim 5 exchanged the following messages:

Stranger Things: I'm horny but I'm not home [Tired face emoji]

Minor Victim 5: me to

Stranger Things: You can send me stuff I'm sitting in the backseat of the car right now mom's in the store

Minor Victim 5: let me see

Stranger Things: Ok, Can you?

Minor Victim 5: yes, but can i see you in the car

62

Stranger Things: Okay can you do one for me that I tell you to do [sent attachment], My pussy is wet [weary emoji]

Minor Victim 5: [sent an attachment]

126. Communications with Minor Victim 2, Minor Victim 3, and Minor Victim 6 were not observed in the Stranger Things records. Based upon my training and experience, I believe Stranger Things was operating other fake Instagram accounts to communicate with and obtain CSAM from those victims.

Minor Victim 7

127. Stranger Things made multiple references to "Cassie" throughout conversations observed in the search warrant results. In many of those instances, Stranger Things referred to obtaining images, both sexual and non-sexual, from Cassie. Stranger Things made statements indicating he feared that Cassie would discover he was posing as her in a fake account. On July 17, 2023, Stranger Things told Mean Pickle, "Well I'm fucked Cassie found out I'm pretending to be her." On July 22, 2023, Stranger Things told Butterfly, "Well I'm fucked Cassie found out I'm pretending to be her."

128. On August 17, 2023, an Instagram user belonging to a group that included Stranger Things, posted a screenshot of the Instagram account "cassie.baby.alives", then stated, "This is the real Cassie." Based upon my training and experience, I believe Cassie (Hereinafter Minor Victim 7) was in communication with a different account operated by Stranger Things. Stranger Things would obtain images both CSAM and otherwise in real time to make his "Cassie" persona portrayed by the Stranger Things account more realistic

63

129.     Communications with Minor Victim 7 were not observed in the Stranger Things records. Within the linked media files that were provided with the Stranger Things records were multiple images of CSAM depicting a minor female believed to be Minor Victim 7. One of those videos was consistent with the definition of CSAM and is further described as follows:

> A full-color video, approximately 59 seconds in length, depicting Minor Victim 7 laying on the floor of a bathroom. Minor Victim 7 was approximately 8 to 11 years old, with a tan skin tone and dark hair. The child appeared to be laying on a red towel and a wood vanity is next to her. The child was wearing a white, long-sleeve t-shirt, and was otherwise unclothed. The child's legs were held back at the knees by her arms. The child's anus and vagina were clearly visible. She inserted the handle of a hair brush into her vagina. The file name was "reported_message_584089620503514.mp4"

Use of multiple phones

130.     Records provided by Meta Platforms, Inc. indicated that four separate Universal Unique Identifiers for android devices were associated with the Stranger Things account. The devices were associated with the account on June 11, 2022, September 16, 2022, October 14, 2022 and January 18, 2022. The records indicated the devices were still active.

131.     The user of Stranger things referenced the use of another phone in conversations with other subjects. On July 11, 2023, the user of Stranger Things messaged Mean Pickle, "I believe so it's on my other phone I'll send them in a sec." On July 15, 2023, Stranger Things messaged Gansta, "Yeah but I kind of can't look at my other phone right now cuz it's charging" and "well sending I had to use my other phone in order to record." On July 21, 2023, Stranger Things separately messaged Baker, Butterfly, and Gansta, "I'm working the next 11 days I don't have my other phone so I won't be able to check recordings [sad face emoji] I knew I should have brought it with I'm out of town too and won't be home till next Sunday."

64

132.     Based upon my training and experience, I believe the user of Stranger Things utilizes multiple cell phones to maintain multiple personas of children on Instagram. I further believe the user of Stranger Things maintained one of the devices on his person and at least one device at his residence.

Identification of Stranger Things

133.     On July 12, 2023, the user of Stranger Things messaged with Gansta regarding exchanging money so Gansta could purchase videos from the GREC: Recorder application. Stranger Things stated he could send money via his Cashapp account $tubbyorr2020.

134.     On January 9, 2024, Block, Inc. provided information in response to a subpoena requesting user account information and IP addresses associated with Cashapp account $tubbyorr2020. The following user information was provided:

     a.     Identity Verification Name: Nicholas Orr

     b.     Date of Birth: 03/12/1994

     c.     Address history: 38 South Military Road, Fond du Lac, Wisconsin

     d.     Address history: 350 Winnebago Street, North Fond du Lac, Wisconsin

     e.     Email address: nicholasorr12908@gmail.com

     f.     SMS: 920-251-4725

135.     While reviewing the Stranger Things Instagram records, additional information was observed identifying Nicholas Orr (XX/XX/1994) as the user of the account.

136.     On June 6, 2023, Stranger Things sent Baker a message stating, "No I haven't but I have to watch what I do now because that Michael guy is after me again and yes Nicholas is my real name now you guys know the truth."

65

137. On June 6, 2023, Stranger Things sent Mean Pickle a message stating, "She told me when I called that I need to work for it [crying laughing emoji] she knows what I look like cause we ft she's ok with me being a little older, And I'm almost f****** 30 dude." On June, 6, 2023, Nicholas Orr would have been 29 years old.

138. A search of the Wisconsin Circuit Court Access Program (CCAP) revealed that Nicholas Orr plead guilty in Fond du Lac County Circuit Court to violating Wisconsin State statute 948.02(2) 2nd Degree Sexual Assault of a Child on July 14, 2023. The court record indicated that Orr changed his address from 77 6th Street, Fond du Lac, WI to 90 Warner Street, Fond du Lac, WI on July 18, 2023. This change in address was consistent with the change in IP addresses utilized by Stranger Things.

139. On June 20, 2023, Stranger Things sent Gansta a message stating, "Let him what is she going to do message me and say hey are you using a fake account I mean like I said it's the least we can do I'm getting locked up in 3 weeks bro I want to see her before I go." Based upon my training and experience, I believe Orr assumed he would be taken into custody at the time of his plea hearing on July 14, 2023. The date of the hearing was approximately three weeks after Orr made the statement as Stranger Things.

140. On July 9, 2023, Stranger Things sent Gansta a message stating, "Hey Friday I have court I'm gonna give you my passwords to my accounts if you don't hear from me by Friday afternoon then these accounts are yours to use therefore I'm going to send you all of the pictures of Cassie that I have that you can use." Orr made the statement on the Sunday prior to his July 14, 2023 plea hearing.

66

141.    On July 14, 2023, Stranger Things sent Gansta a message stating, "Okay pretty soon I'm going to give you both of my accounts and both passwords and then I want to share everything with you on telegram that you can use in case you don't hear from me tomorrow afternoon." Stranger things subsequently sent a message which included usernames "stranger_things2132" and "lucas_the_best22" along with apparent passwords for the accounts. Orr made the statement on the same date as his sentencing hearing.

142.    On July 14, 2023, Stranger Things sent Gansta a message stating, "I'm still free [large smile emoji] [free emoji] [large smile emoji] till October 2nd." Based upon my training and experience, I believe Orr made the statement after he was not taken into custody at his plea hearing on the same date. According to Wisconsin CCAP, Orr was sentenced on October 2, 2023.

143.    On July 20, 2023, Stranger Things sent Butterfly a message stating, "Yeah I'm going out of town I'm going to be working at EAA airventure." Investigators were aware that "EAA Airventure" refers to the Experimental Aircraft Association (EAA) AirVenture air show hosted annually in Oshkosh, Wisconsin. The EAA air show website listed the 2023 air show dates as July 24, 2023 to July 30, 2023.

144.    On July 28, 2023, Stranger Things sent Gansta a screenshot of a weather map with an arrow pointing to a circle around Oshkosh, WI. The weather map showed strong storms within the circle around Oshkosh, WI. A short time later, Stranger Things sent Gansta a message stating, "That's where I'm working for the air show lol good thing I'm sitting in a car."

145.    An open-source search of Facebook identified an account with the display name, "Nicholas Orr". The account indicated the user lived in Fond du Lac, Wisconsin. The occupation

67

listed for the account user was "Security at EAA AirVenture Oshkosh." Investigators identified Nicholas Orr (XX/XX/1994) to be the person in the profile photo of the Facebook account.

146. On July 29, 2023, Stranger Things sent a close-up photo of a white male's leg from above the ankle to the below the knee. The perspective of the photo indicated it was taken by the person whose leg was in the photo. A portion of the leg was shaved and depicted a tattoo of four red and black five-pointed stars with interconnected designs. A tropical flower tattoo was also visible in the unshaven portion of the leg.

147. A search of the Wisconsin Department of Corrections Inmate locator provided a description of Nicholas Orr's tattoos. Tattoos on Orr's right calf included a flower and four five-point stars.

148. Nicholas Orr pled guilty to a charge of 2nd Degree Sexual Assault of Child in Fond du Lac County Circuit Court on October 2, 2023. On or about November 14, 2023, Nicholas Orr was taken into custody at the Fond du Lac County Jail to begin serving a prison sentence. On November 28, 2023, Laurie Wischow took possession of the property that was in Nicholas Orr's possession at the time he entered the jail. A Fond du Lac County Jail Property Release form was signed by Laurie Wischow and indicated her telephone number was 920-924-9491.

149. On May 9, 2024, investigators obtained recordings of calls made by Nicholas Orr while he was in custody at the Fond du Lac County Jail. On or about November 14, 2023, Orr initiated a telephone call to telephone number 920-924-9491. During the call, Orr asked Laurie Wischow for her address. Wischow stated her address was "**285 Ledgewood Drive**."

150. On or about November 15, 2023, Orr initiated a telephone call to telephone number 920-539-6798. Orr identified the person he was speaking with as "Kalyn."

68

151. A search of law enforcement databases revealed telephone number 920-539-6798 was associated with Kalyn Cooley of 90 Warner Street, Fond du Lac, WI, 54935. Nicholas Orr was also known to reside at the same address prior to beginning his prison sentence.

152. On November 19, 2023, Nicholas Orr had a recorded conversation with Laurie Wischow during a visitation at the Fond du Lac County Jail. During the conversation referenced Kalyn Cooley and stated, "The only problem is, if she moves out of state, how am I going to get all of my stuff, unless she releases it all over to you." Wischow asked Orr, "What all do you have over there?" Orr responded, "Just a big ass tote." Later in the conversation, Orr stated, "When you get my phone, try to keep it on and active as much as possible because I'm going to need something when I get out." Orr also indicated that Wischow did not need to keep cellular service active on the phone. Orr asked Wischow to keep the phone on and charged.

153. During a call with Kalyn Cooley on November 21, 2023, Orr referred to her as his roommate and discussed living with Cooley when he completed his prison sentence.

154. A search of law enforcement databases revealed that Laurie Wischow's address was **285 Ledgewood Drive, Fond du Lac, WI**.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

155. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a. Computers, cellular telephones, and other electronic storage devices (collectively electronic storage devices) have dramatically changed the way in which individuals interested in child pornography interact with each other. Electronic storage devices basically

69

serve four functions in connection with child pornography: production, communication, distribution, and storage.

b. Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a device by simply connecting the camera to the electronic storage device. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store terabytes of data, which provides enough space to store thousands of high-resolution photographs. Video recorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the video recorder to a computer. Many electronic storage devices (e.g., computers, cellular telephones, and tablets), have cameras built into the device which allows users to create and store still and video images on the device. Moreover, if the device has internet connectivity, users can distribute still and video images from the device.

c. Internet-enabled electronic storage devices can connect to other internet-enabled devices the world over. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to an internet-enabled electronic storage device. Because of the proliferation of commercial services

70

that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, electronic storage devices are the preferred method of distribution and receipt of child pornographic materials.

d. Electronic storage devices are the ideal repository for child pornography. The amount of information that an electronic storage device can hold has grown exponentially over the last decade. Electronic storage devices can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on a computer or other electronic storage device. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Many electronic storage devices can easily be concealed and carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any internet-enabled electronic storage

71

device. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's electronic storage device in most cases.

g. As is the case with most digital technology, communications by way of electronic storage device can be saved or stored on the device. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, an electronic storage device user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h. Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

156. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards,

cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.

157.    Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime.  This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

158.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who transport, distribute, receive, possess, and/or access with intent to view child pornography:

73

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

d. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

74

e.	Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.	Such individuals prefer not to be without their child pornography for any prolonged period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.  Thus, even if an individual, uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in the SUBJECT PREMISES, as set forth in Attachment A.

## **CONCLUSION**

I respectfully request that this Court issue a search warrant for the location described in Attachment A and authorizing the seizure and search of the items described in Attachment B.

75

<u>**Attachment A**</u>

DESCRIPTION OF LOCATIONS TO BE SEARCHED:

1.        The entire property located at **285 LEDGEWOOD DRIVE, FOND DU LAC, WI, 54937**. The residence is more particularly described as an apartment within the Meadowview Homes Apartments at Whispering Springs. Apartment 285 is located in the second of three buildings, recessed into the building between apartments "283" and "287". The number "285" is affixed to the exterior entrance to the apartment. This warrant authorizes the search of the SUBJECT PREMISES, any common areas accessible by the occupants of the SUBJECT PREMISES, any storage units or outbuildings associated with the SUBJECT PREMISES, as well as any appurtenances thereto. The exterior of the SUBJECT PREMISES has off-white with a quarter wall light colored brick facade. The residence has a walkway that extends from the parking lot to a white or cream front door on the west side of the building facing Ledgewood Drive.

Pictures of the residence are provided below:

76



- Computers and storage media found therein believed to belong to Nicholas Orr.

- Any person who appears to reside at the SUBJECT PREMISES believed to be maintaining a device belonging to Nicholas Orr on their person.

77

<u>**Attachment B**</u>

<u>Items to be Seized</u>

1. Cell phones, computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors believed to belong to or utilized by Nicholas Orr that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs believed to have been utilized by Nicholas Orr.

3. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) believed to belong to or utilized by Nicholas Orr pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

78

5. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by Nicholas Orr through the operation of any device by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) believed to belong to or utilized by Nicholas Orr, identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) believed to belong to or utilized by Nicholas Orr, concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr concerning communications between individuals about child pornography or the existence of

79

sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr that concern any accounts with an Internet Service Provider.

11. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12. Any and all cameras, film, videotapes or other photographic equipment believed to belong to or utilized by Nicholas Orr.

13. Any and all visual depictions of minors believed to belong to Nicholas Orr.

80

14. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) believed to belong to or utilized by Nicholas Orr, pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities by Nicholas Orr with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16. For any electronic storage device, computer hard drive, electronic device, or other physical object believed to belong to or utilized by Nicholas Orr upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

81

b. evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

e. evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h. evidence of the times the electronic storage device was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device;

k. contextual information necessary to understand the evidence described in this attachment.

17. Records and things evidencing the use by Nicholas Orr of the Internet Protocol addresses to communicate with the internet, including:

a. routers, modems, and network equipment used to connect electronic storage devices to the Internet;

b. records of Internet Protocol addresses used;

c. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of residents of the SUBJECT PREMISES to the Touch ID sensor of device(s) or scan for facial recognition, such as an iPhone. Android, or Tablet, found at the premises for the purpose of attempting to unlock the device via fingerprint or facial recognition in order to search the contents as authorized by this warrant. If facial recognition is required, the subject will remain still and look, with eyes open, at the camera for any devices seized in connection if this warrant for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

83